*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

GWENDOLYN JOSEPHINE ALEXANDER,

    Defendant-Appellant.

FOR PUBLICATION
November 20, 2024
9:29 AM

No. 364063
Wayne Circuit Court
LC No. 20-001501-02-FC

Before: K. F. KELLY, P.J., and CAVANAGH and RIORDAN, JJ.

K. F. KELLY, P.J.

Defendant appeals by right her jury-trial convictions for one count of torture, one count of second-degree child abuse, one count of second-degree child abuse in the presence of another child, and one count of third-degree child abuse. Defendant was sentenced to 17 to 30 years' imprisonment for the torture conviction, 6½ to 10 years' imprisonment for the second-degree child abuse conviction, 6½ to 10 years' imprisonment for the second-degree child abuse in the presence of another child conviction, and 96 days in jail for the third-degree child abuse conviction.

Defendant raises numerous issues on appeal concerning her convictions, chiefly that the trial court committed plain error when it permitted the prosecution's expert to testify regarding the "medical torture" diagnosis. Because the contested terminology did not have the potential to conflate the expert's medical diagnosis with any legal conclusion concerning defendant's legal responsibility, we affirm defendant's convictions. However, as a result of errors of law made by the trial court concerning the scoring of offense variable ("OV") 5 and OV 7, we vacate defendant's sentences and remand to the trial court for resentencing in accordance with this opinion.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant and codefendant Errown Robinson-Burton Scott were in a domestic relationship for approximately five years at the time of the lower court proceedings. Defendant, Scott, and

defendant's minor children, MLA, RRS, and MMS,[1] resided in a mobile home parked on property owned by Scott's mother in Detroit, Michigan. Defendant and Scott were charged as a result of allegations following a welfare check that the two physically disciplined MLA and RRS and, in the presence of his siblings, defendant and Scott repeatedly bound MLA's wrists and ankles using zip ties in order to control the minor child's alleged misbehavior.

In January 2020, Ranisha Bowden, the godmother of MLA, was concerned about MLA's well-being and contacted child protective services ("CPS") and law enforcement requesting a welfare check. The authorities arrived at the property and, after observing the condition of the mobile home and signs of abuse and neglect of the minor children, the children were subsequently escorted to the local children's hospital. At the hospital, the children underwent medical examinations, during which the supervising physician, Dr. Shazia Maqbool, noted there were linear scars around MLA's wrists and ankles, in addition to swelling and tenderness around both of MLA's ankles. Following an investigation, defendant and Scott were arrested and criminally charged with child abuse and torture. In March 2020, a second physician, Dr. Dena Nazer, examined the minor children, and she diagnosed MLA and RRA with "medical torture" as a result of her belief that the two were exposed to at least two distinct incidents of physical assault and at least two psychological maltreatments. Dr. Nazer further noted the ligature markings on MLA's extremities remained visible six weeks after the incident.

Following a five-day jury trial, during which Dr. Maqbool and Dr. Nazer served as the prosecution's expert witnesses, defendant was convicted of one count of torture, MCL 750.85, one count of second-degree child abuse, MCL 750.136b(3), one count of second-degree child abuse in the presence of another child, MCL 750.136d(1)(b), and one count of third-degree child abuse, MCL 750.136b(5).[2] Defendant was sentenced as noted earlier, and this appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that her conviction should be overturned because there was insufficient evidence to convict her of torture. We disagree.

## A. STANDARDS OF REVIEW

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Byczek*, 337 Mich App 173, 182; 976 NW2d 7 (2021). In evaluating a defendant's claim concerning the sufficiency of the evidence, we review the evidence in a light most favorable to the prosecution to discern whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Head*, 323 Mich App 526, 532; 917 NW2d 752 (2018). When reviewing a

---

[1] Defendant and Scott are the parents of RRS and MMS; MLA is the only child with a different father.

[2] Defendant was acquitted of one count of third-degree child abuse concerning one of her minor children, RRS.

-2-

sufficiency claim on appeal, we "must defer to the fact-finder by drawing all reasonable inferences and resolving credibility conflicts in support of the jury verdict." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007).

## B. ANALYSIS

Torture is defined under MCL 750.85, which states, in pertinent part:

> (1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.
>
> (2) As used in this section:
>
> (a) "Cruel" means brutal, inhuman, sadistic, or that which torments.
>
> (b) "Custody or physical control" means the forcible restriction of a person's movement or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.
>
> (c) "Great bodily injury" means either of the following:
>
> (*i*) Serious impairment of a body function as that term is defined in section 58c of the Michigan vehicle code, 1949 PA 300, MCL 257.58c.
>
> (*ii*) One or more of the following conditions: internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds.
>
> * * *
>
> (3) Proof that a victim suffered pain is not an element of the crime under this section. [*People v Schaw*, 288 Mich App 231, 233-234; 791 NW2d 743 (2010), quoting MCL 750.85.]

Accordingly, to convict defendant of torture, the prosecution was required to demonstrate beyond a reasonable doubt that (1) defendant intended to cause cruel or extreme physical or mental pain and suffering, (2) defendant inflicted great bodily injury, and (3) the complainant was within defendant's custody and control. MCL 750.85; *Schaw*, 288 Mich App at 233-234. Defendant only contests the sufficiency of the evidence as to the first two elements.

Defendant argues that the prosecution failed to establish the requisite intent element, as (1) defendant explained that she opted to bind MLA with zip ties because of MLA's concerning behavior, which required constant supervision, and (2) defendant's conduct arose out of her inability to provide proper care for MLA as she was also responsible for her other minor children.

While defendant's alleged acts of restraining MLA may hardly be classified as accidental or inadvertent, torture is a specific-intent crime requiring a finding that a defendant acted to cause cruel or extreme physical or mental pain and suffering to a person under restraint or confinement by the defendant. See MCL 750.85. "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). A defendant's intent may be inferred "from his words or from the act, means, or the manner employed to commit the offense." *People v Hawkins*, 245 Mich App 439, 458; 628 NW2d 105 (2001).

While defendant attempts to justify her behavior of binding MLA with zip ties as a means of controlling the minor child's conduct, her own statements and the severity of the cut marks on MLA's wrists and ankles indicate otherwise. See *Brown v Brown*, 332 Mich App 1, 10; 955 NW2d 515 (2020) ("It has long been established that a parent may not administer excessive physical discipline, or physical discipline that actually harms a child, no matter what the parent might subjectively believe."); see also *People v Green*, 155 Mich 524, 533; 119 NW 1087 (1909) ("[I]t is the unquestionable right of parents and those *in loco parentis* to administer such reasonable and timely punishment as may be necessary to correct growing faults in young children; but this right can never be used as a cloak for the exercise of malevolence or the exhibition of unbridled passion on the part of a parent."). The hospital photographs admitted at trial depict notable, dark ligature markings on MLA's extremities, such that defendant could not possibly have been unaware that she was inflicting pain on MLA when using them. Defendant additionally recognized that MLA continually struggled against being restrained, as defendant attributed the markings on MLA's wrists to the restraint being "too tight," and MLA attempting to "shimmy out of it" or "tightening it up as he's pulling to trying to weasel his way out of it." Moreover, the act of binding MLA, in conjunction with his repeated exposure to physical discipline with a belt and ruler, his inability to use the bathroom and the discovery of bottles filled with urine in the family's mobile home, MLA's withdrawal from school, MLA's sleeping on the floor of the mobile home, and MLA's "thin" appearance, were all further indicative of defendant's intent. Defendant additionally neglected to seek alternate means to address MLA's alleged misbehavior and opted to restrain, or allow Scott to restrain, her six-year-old child with plastic zip ties. In light of these circumstances, the jury could conclude beyond a reasonable doubt that defendant intended to cause MLA cruel or extreme physical or mental pain and suffering by repeatedly binding his extremities with zip ties.

Defendant also argues that there was insufficient evidence that defendant inflicted great bodily injury against MLA. The term "great bodily injury" is defined, in part, as the "[s]erious impairment of a body function as that term is defined in section 58c of the Michigan Vehicle Code, 1949 PA 300, MCL 257.58c." MCL 750.85(2)(c)(*i*). Under MCL 257.58c, "[s]erious impairment of a body function" includes a "[s]erious visible disfigurement." MCL 257.58c(e). In the instant matter, a reasonable trier of fact could have readily concluded that MLA suffered a serious visible disfigurement. The prosecution presented photographs depicting scarring and hyperpigmentation around MLA's ankles and wrists, which both expert physicians characterized as ligature marks. While defendant suggests that Dr. Nazer testified that the ligature markings on MLA's extremities were "healing," or less prominent, we have previously held that an injury under MCL 257.58c need not be permanent or long lasting to qualify as a "serious impairment of a body function." *People v Thomas*, 263 Mich App 70, 76; 687 NW2d 598 (2004) ("We first note that an injury need

not be long-lasting to be considered a 'serious impairment.' "). Furthermore, the evidentiary record indicates that Dr. Nazer indicated that the initial wounds, which led to the subsequent scars on MLA's wrists and ankles, had healed enough to result in a scar, not that the scars were no longer visible or prominent. Dr. Nazer testified: "The significant findings on [MLA's] exam were scars that are almost circumferential, meaning that they go around both of his wrists and go both around both of his ankles as well." Dr. Nazer further differentiated between a wound and scar, noting:

> So a wound to me is a cut. Now, when we examined [MLA], he had the scars on his wrists. The scars were described as being hyperpigmented, which means that they had a darker color compared to the rest of his skin.
>
> So it's hard to—it's hard to say whether this had started off as abrasions or a cut in the skin or they had started off as bruises. It's really hard because at this point because it had healed.

Defendant additionally advances that while MLA's injuries may qualify as a visible disfigurement, the marks could not be defined as "serious" because such scarring did not lead to death or severe health consequences, or require further treatment. However, the child's disfigurement was visible and serious, as indicated by its physical characteristics and the fact the disfigurement remained visible six weeks after the subject incident. See *id*. at 77 ("We conclude that this lesser impairment, itself within the statutory list, suffered for a much greater time than required for a more serious injury within the list, is properly considered as falling within the 'serious impairment' category."). Furthermore, when Dr. Nazer was questioned regarding the severity of MLA's injuries, she "consider[ed] them severe" but "healed," and she "would still have considered them severe because of the nature of the wounds." Thus, viewed in a light most favorable to the prosecution, the evidence was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that MLA suffered a "serious impairment of body function" within the meaning of the criminal statute.

## III. EXPERT WITNESS TESTIMONY

Next, defendant argues that the trial court plainly erred when it permitted the prosecution's expert witness to testify regarding the diagnosis of "medical torture." Defendant further argues that the court erred when it allowed the prosecution's expert witness to testify regarding facts that were never admitted into evidence in violation of MRE 703.[3] We disagree.

---

[3] "To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Defendant did not object to the testimony of the prosecution's expert witness, Dr. Nazer, on the basis that her use of the diagnostic term "medical torture" invaded the province of the jury. Accordingly, this issue is not preserved on appeal. See *id*. However, defendant did object to Dr. Nazer's testimony on the grounds that her use of hearsay statements and inadmissible facts amounted to a violation of MRE 703; therefore, this issue is preserved for appellate review. See *Thorpe*, 504 Mich at 252.

## A. STANDARDS OF REVIEW

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion[,]" and such decisions "will not be disturbed unless that decision falls outside the range of principled outcomes." *Thorpe*, 504 Mich at 251-252 (quotation marks and citation omitted). A trial court necessarily abuses its discretion when it premises its decision on an error of law. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). However, "[a] decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Thorpe*, 504 Mich at 252. "This Court reviews de novo whether the trial court properly interpreted and applied the rules of evidence." *McFarlane*, 325 Mich App at 517. "This Court also reviews de novo constitutional questions . . . such as whether the trial court improperly allowed a witness to invade the province of the jury." *Id.*

"However, when issues are unpreserved, this Court must review the unpreserved claim for plain error affecting defendant's substantial rights." *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 5 (quotation marks and citation omitted).

> To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights. An error affects substantial rights when it impacts the outcome of the lower-court proceedings. Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independently of the defendant's innocence. [*People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021) (quotation marks and citations omitted).]

## B. ANALYSIS

A trial court may allow testimony of a "witness qualified as an expert by knowledge, skill, experience, training, or education" if the court ascertains that the "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." MRE 702. During a trial proceeding, an expert may advance an opinion if his or her testimony is "based on sufficient facts or data," if the testimony "is the product of reliable principles and methods," and if the witness "has applied the principles and methods reliably to the facts of the case." *Id.* "The trial court must also ensure that the expert's testimony is relevant." *McFarlane*, 325 Mich App at 518. And "[e]ven when an expert's testimony is relevant, it remains subject to the limits imposed by MRE 403." *Id.*

In *McFarlane*, we examined whether medical expert testimony invaded the province of the jury by citing accepted medical terminology that may be misconstrued by laypersons as imparting emotionally-charged or legally conclusory connotations. *Id.* at 517-527. We determined that the trial court plainly erred when it permitted the prosecution's expert witness, a child abuse pediatrician, to use the diagnostic terms "abusive head trauma" and "definite pediatric child abuse," in her trial testimony, considering the defendant was charged with first-degree child abuse. *Id.* at 523-527.

Ultimately, the contested diagnoses implicated a level of willfulness and culpability that was solely within the purview of the jury to determine, as the prosecution's expert witness expressly connected said diagnoses to the defendant's state of mind. The Court noted:

> [The expert witness] repeatedly told the jury that [the complainant's] injuries were "caused by definite pediatric physical abuse," and she stated that "we know that abusive head trauma" causes these injuries because people confess to hospital staff and investigators or other family members after inflicting the injuries. She also agreed that [the complainant] had suffered previous abuse even though she was only nine weeks old. She further told the prosecutor that she was correct when the prosecutor noted that [the expert witness] looked at the totality of the circumstances before concluding that this case involved "child abuse." [*Id*. at 524.]

We clarified that "a physician may properly offer an opinion that, when the medical evidence is considered along with the child's history, the child's injuries were inflicted rather than caused by accident or disease because a jury is unlikely to be able to assess the medical evidence." *Id*. at 522. However, the *McFarlane* expert witness exceeded those bounds by providing an opinion that essentially implicated the defendant's intent in perpetrating the alleged acts of abuse. *Id*. at 523.

This is not the case here. The contested terminology in this case did not have the potential to conflate Dr. Nazer's medical diagnosis with a legal conclusion concerning defendant's legal responsibility. Again, to convict defendant of torture, the prosecution was required to demonstrate beyond a reasonable doubt that (1) defendant intended to cause cruel or extreme physical or mental pain and suffering, (2) defendant inflicted great bodily injury, and (3) the complainant was within defendant's custody and control. MCL 750.85; *Schaw*, 288 Mich App at 233-234. During her trial testimony, Dr. Nazer, an expert in general pediatrics and child abuse pediatrics, shared that she made a medical, not legal, diagnosis of "medical torture" after having the opportunity to review the minor child's medical records, conduct a physical examination, and interview MLA. See *People v Ackley*, 336 Mich App 586, 595; 970 NW2d 917 (2021) ("[W]here it is possible to draw a medical diagnosis based on a physical examination, as opposed to a complainant's self-reporting, an expert is fully permitted to testify that, in their opinion, a particular injury was not accidentally self-inflicted."). Dr. Nazer explained:

> So medical torture is a clinical diagnosis. It's a medical diagnosis that we give children who have been exposed to at least two different physical assaults, so two physical assaults at two different times.

> And it's not just the physical assaults. To qualify for the diagnosis of medical torture, it has to be accompanied by at least two psychological maltreatments or two forms of psychological abuse. So, for example, isolation, deprivation, intimidation. If we have two of those and then two physical assaults or one prolonged physical assault, then we can reach the diagnosis of medical torture.

> So it's beyond the examination or beyond the evaluation of just physical abuse. This is a child who is diagnosed with physical abuse and it's psychological maltreatment as well.

Dr. Nazer noted that medical torture was "not a very common diagnosis, it's only reserved for severe cases of severe psychological maltreatment. It's not something that we make very often and we have to be able to obtain information from other sources regarding the treatment at home." See *id*. Dr. Nazer further asserted that "[t]he injuries on [MLA's] wrists and on his ankles, they're consistent with ligature marks and they're consistent with his history of being tied with zip ties."

Also, unlike in *McFarlane*, in this case Dr. Nazer did not suggest that defendant acted knowingly or intentionally when she testified that the children were diagnosed with medical torture or addressed any element of the crime charged. As described above, the term "medical torture" is a medical diagnosis reserved for only severe cases in which the victim is subjected to at least two instances of physical harm and two instances of psychological harm, but does not suggest any amount of intentionality. Furthermore, while the prosecution noted in its closing argument that Dr. Nazer had characterized the symptoms as having been caused by abuse, the prosecution did not advance that the jury should rely on Dr. Nazer's testimony in its determination of whether defendant possessed the requisite intent to establish torture. Rather, the prosecution contended that defendant's own statement to law enforcement, the severity of MLA's injuries, the testimonies of various nonexpert witnesses, and defendant's subsequent actions tended to establish defendant's guilt. See *McFarlane*, 325 Mich App at 526 (opining any prejudice arising out of the expert witness's improper characterization of the acts was lessened, in part, by the prosecution informing the jury, in its closing argument, not to rely on the expert witness's opinion in deciding whether the defendant had the requisite intent to establish first-degree child abuse); *People v Murray*, 234 Mich App 46, 60; 593 NW2d 46 (1999) (reasoning that the expert witness did not invade the province of the jury because, in part, "the prosecutor argued only the facts of th[e] particular case during her closing arguments."). Similarly, the dangers of an expert witness invading the province of the jury are not present in circumstances in which, "in expressing his ideas and opinion on the matter, the witness refers to legal standards properly explained by the trial court or examining attorney." *People v Robinson*, 417 Mich 231, 234; 331 NW2d 226 (1983).

But even if we agreed with defendant that the admission of the testimony was an abuse of discretion, under plain error review, the trial court's error in admitting the testimony does not entitle defendant to relief unless she can establish that the error affected the outcome of the lower court proceedings. See *McFarlane*, 325 Mich App at 525. "Our review for prejudice does not consider what outcome might have ensued if the prosecution's experts had not opined that [the complainant] suffered nonaccidental injuries, but rather what might have ensued if the prosecution's experts had phrased their opinions using less emotionally and legally suggestive terminology." *Ackley*, 336 Mich App at 595. While Dr. Nazer opined that MLA's injuries indicated that the minor child was exposed to at least two distinct physical assaults and at least two psychological maltreatments, warranting a diagnosis of "medical torture," she detailed her diagnosis was a consequence of her review of the medical records admitted in evidence, which included photographs of the ligature marks on MLA's extremities and an x-ray of the minor child's ankles. See *Robinson*, 417 Mich at 234.

Thus, even without the employment of terminology "medical torture," Dr. Nazer could have properly testified about the extent of MLA's injuries, the nonaccidental nature of the minor child's injuries, his repeated exposure to physical assault and psychological harm, and the nature of MLA's statements during his examination. Additionally, Dr. Maqbool testified that the overall presentation of MLA's injuries was indicative of child abuse due to the nature of the linear scars

around MLA's wrists and ankles, in addition to swelling and tenderness around both of MLA's ankles. Most pertinently, defendant herself acknowledged that there were numerous occasions during which MLA was physically disciplined with a ruler or belt, and MLA was bound, by either defendant or Scott, to address MLA's alleged misbehavior. See *Ackley*, 336 Mich App at 596 ("In other words, for the most part, the substance of the experts' testimonies would have been conveyed to the jury in any event, and thus, the other nonscientific evidence would still have been considered in that context.").

Moreover, Dr. Nazer expressed that she believed both MLA and RRS suffered from medical torture, and she advanced similar testimony regarding the two minor children. However, the jury acquitted defendant of the third-degree child abuse charge related to her alleged acts toward RRS, and the jury acquitted Scott as to the torture charge arising out of his alleged conduct toward MLA. If the jury had, as defendant contends, thoughtlessly determined that a diagnosis of medical torture alone was sufficient to find a person guilty of an offense, then the jury would have convicted the parties accordingly. However, the evidence presented regarding defendant's conduct and the nature and extent of MLA's injuries, compared to RRS, appeared to weigh in the jury's determination as to what of defendant's alleged acts warranted a conviction. Moreover, the trial court stated it would "instruct the jury that you are not to consider [the aforementioned testimony] as evidence that that actually did happen. You may only consider it as to why this doctor reached her conclusions which would be appropriate." See *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) ("Jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors.") (quotation marks and citation omitted). Thus, even if the trial court plainly erred by allowing Dr. Nazer to use the label "medical torture," it is unlikely that the error affected the outcome of the trial considering the evidence presented. Therefore, the error does not warrant relief.

Defendant also argues that the court erred when it permitted Dr. Nazer to testify regarding facts that were never admitted into evidence, in violation of MRE 703. At the time of defendant's trial, MRE 703 stated:

> The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence thereafter.

"This rule permits an expert's opinion only if that opinion is based exclusively on evidence that has been introduced into evidence in some way other than through the expert's hearsay testimony." *People v Fackelman*, 489 Mich 515, 534; 802 NW2d 552 (2011) (quotation marks and citation omitted). Thus, a party must establish that facts or data used to form the expert's opinion are admissible at trial. *People v Yost*, 278 Mich App 341, 363; 749 NW2d 753 (2008).

> It necessarily follows that an expert witness may not base his or her testimony on facts that are not in evidence. An expert witness need not rule out all competing and alternative theories, but he or she must have a sound evidentiary basis for his or her conclusions. An expert witness's opinion is objectionable if it is based on assumptions that do not accord with the established facts. When an expert's opinion is based on assumptions that are contrary to the facts in evidence, it is

technically irrelevant to the actual issues at trial. [*People v Unger*, 278 Mich App 210, 248; 749 NW2d 272 (2008) (citations omitted).]

At trial, Dr. Nazer testified that her education, training, and experience provided her with knowledge concerning "how to evaluate children, how to perform medical exams, how to identify injuries, how to diagnose, how to teach, how to conduct research all related to child abuse and neglect." Dr. Nazer further testified that prior to performing her evaluations of MLA, she examined the minor child's medical records, which included a number of photographs of MLA's injuries and the results of MLA's x-ray report, in addition to information provided by the forensic interviewer. Dr. Nazer also interviewed defendant, Scott, and the minor children before she conducted the physical examination of MLA. After completing her assessment of MLA, Dr. Nazer "gave him the diagnosis of medical torture," which entailed psychological maltreatment and physical abuse. Dr. Nazer expressed that her "medical torture" diagnosis was "based on information that I received from the forensic interview as well as information that I received during obtaining the medical history from Ms. Bowden, and also information from [MLA] himself." Dr. Nazer shared that her findings were provided in her Children's Advocacy Center ("CAC") report, and a redacted version of the CAC report was admitted during trial. The trial court further admitted the certified medical records of MLA, RRS, and MMS during trial.

The facts and data underlying Dr. Nazer's testimony were fundamentally presented in testimony, documents, and photographs admitted during the five-day jury trial. The redacted CAC report detailed that MLA previously disclosed during his emergency room visitation on January 22, 2020, that he was physically assaulted by Scott on numerous occasions and that he was bound to a bed or chair. Furthermore, the CAC report stated that MLA was not adequately fed by defendant, and there was period of time for which MLA did not attend school, which Bowden, MLA's godmother, testified about. Dr. Nazer additionally provided in the CAC report that MLA informed her that the injuries on his wrists and ankles were the result of being bound with zip ties. MLA also reported to Dr. Nazer that (1) he was barred from interacting with certain family members; (2) he was subject to physical discipline by defendant and Scott; and (3) he was deprived of food, and he was required to sleep on the floor of the mobile home. Furthermore, the admitted hospital photographs captured the various injuries to MLA's wrists and injuries, in addition to a bruise on his face.

We recognize that the portion detailing the forensic interviewer's statements was redacted. However, the portion of the CAC report dedicated to summarizing the forensic interview did not contain any novel facts when compared to the nonredacted portion of the CAC report, in addition to the admitted certified medical records of the minor children. Furthermore, while defendant argues that Dr. Nazer relied on statements by declarants who were neither shown to be "unavailable" nor subject to prior to cross-examination, thereby violating defendant's confrontation rights, Dr. Maqbool, MLA, RRS, and Bowden testified at trial.

To the extent that Dr. Nazer relied on hearsay to formulate a diagnosis, and no hearsay exception applied, an expert is allowed to recount and rely on hearsay if it was used as a basis to form an opinion. See *People v Lonsby*, 268 Mich App 375, 382-383; 707 NW2d 610 (2005), citing MRE 703 ("It is well-settled that an expert witness may rely on hearsay evidence when the witness formulates an opinion"). Dr. Nazer was permitted to advance testimony concerning the alleged abuse of MLA as her opinion was made on the basis of admitted evidence detailing physical

findings and MLA's medical history, in addition to the minor child's statements. MRE 702; see also *Thorpe*, 504 Mich at 255 (noting, an examining physician, if qualified by experience and training relative to treatment of the complainant, can opine with respect to the cause of the complainant's injuries "when the opinion is based on physical findings *and* the complainant's medical history"). Accordingly, it was not error for the trial court to allow Dr. Nazer to testify.

## IV. EFFECTIVE ASSISTANCE OF COUNSEL

Alternatively, defendant argues that she was deprived of the effective assistance of counsel when her trial counsel failed to object to the testimony of the prosecution's expert witness. We disagree.

## A. STANDARDS OF REVIEW

"Generally, whether a defendant had the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012) (quotation marks and citation omitted). "This Court reviews findings of fact for clear error and questions of law de novo." *Id*. "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Chaney*, 327 Mich App 586, 587 n 1; 935 NW2d 66 (2019) (quotation marks and citation omitted).

Defendant failed to move for a new trial or request an evidentiary hearing in the trial court, *Heft*, 299 Mich App at 80, or file with this Court a motion for remand to the trial court for a *Ginther*[4] hearing. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Therefore, our review of defendant's claim of ineffective assistance is limited to mistakes apparent from the record. *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

## B. ANALYSIS

The United States Constitution and Michigan Constitution guarantee a criminal defendant the right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. For a defendant to succeed on such a claim, the defendant must establish "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52.

"The inquiry into whether counsel's performance was reasonable is an objective one and requires the reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012) (quotation marks and citation omitted). "This standard requires a reviewing court to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Id*. (quotation marks and citation omitted).

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

This Court will not substitute its own judgment for that of counsel or use the benefit of hindsight in assessing the defense counsel's competence. *Unger*, 278 Mich App at 242-243). "The [e]ffective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022) (quotation marks and citation omitted).

In his closing argument, defense counsel questioned the validity of Dr. Nazer's testimony, noting that while Dr. Nazer advanced that she saw notable ligature marks on MLA's extremities six weeks after the subject incident, there were no photographs presented to confirm the prominence of the injuries at that point in time. Defense counsel further argued that Dr. Nazer's testimony was flawed, as she failed to schedule a subsequent appointment with MLA, and she neglected to contact the previous physician who examined MLA in the emergency room. Moreover, while defense counsel did not expressly object to Dr. Nazer's use of the term "medical torture," defense counsel repeatedly challenged Dr. Nazer's iteration of hearsay statements during her testimony. Defense counsel argued that Dr Nazer was advancing medical conclusions made on the basis of evidence that was not admitted at trial: "She's talking about duct tape, she's talking about the child being left outside tied up at night. There's been no evidence presented on this record that I heard to support what she's talking about." Defense counsel further stated during his cross-examination of Dr. Nazer, "So now you have medical records and you're coming to what you call a very, very specific and serious conclusions [sic] about medical torture, wouldn't it be important for you to talk to the physician who examined [MLA] back in January?"

Considering defense counsel's argument, and his various objections to Dr. Nazer's testimony, defense counsel may reasonably have abstained from objecting to Dr. Nazer's diagnosis of medical torture and her references to abuse, as defense counsel may argue that her diagnosis was based on incomplete information and may not want to draw further juror attention to the phrase. See *McFarlane*, 325 Mich App at 527-528 ("Given defense counsel's argument, he might reasonably have refrained from objecting to Brown's diagnosis of abusive head trauma and her references to abuse because her claim that she could diagnose child abuse furthered his argument that she was partial and not worthy of credibility"). As there was a plausible and legitimate strategic purpose for defense counsel's choice not to object regarding the use of term, "medical torture," we cannot conclude that the failure to object fell below an objective standard of reasonableness under prevailing professional norms. See *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 16 (concluding defense counsel was not ineffective for failing to object to the police detective's testimony as the record reflected that defense counsel effectively cross-examined the police detective, and defense counsel effectively challenged his testimony regarding facts pertinent to the underlying charge). Furthermore, to the extent defense counsel was ineffective, as previously explained, it is unlikely that Dr. Nazer's use of the label "medical torture" affected the outcome of the trial. Accordingly, even if defense counsel should have objected, his failure to do so does not constitute ineffective assistance warranting a new trial. See *Trakhtenberg*, 493 Mich at 51.

## V. SENTENCING

Defendant argues that the trial court erred in assessing OV 5 and OV 7, resulting in the imposition of a sentence beyond the correctly scored sentencing guidelines range. We agree.

## A. STANDARDS OF REVIEW

Generally, "[u]nder the sentencing guidelines, a trial court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Abbott*, 330 Mich App 648, 654; 950 NW2d 478 (2019). Clear error exists when this Court is "left with a definite and firm conviction that a mistake was made." *Id*. "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. (quotation marks and citation omitted). However, because defendant neglected to preserve the sentencing matters for appellate review,[5] this Court may review the unpreserved scoring issues for plain error affecting substantial rights. *People v Chelmicki*, 305 Mich App 58, 69; 850 NW2d 612 (2014) (quotation marks and citation omitted).

## B. ANALYSIS

"Offense variables must be scored giving consideration to the sentencing offense alone, unless otherwise provided in the particular variable." *People v McGraw*, 484 Mich 120, 133; 771 NW2d 655 (2009). "This Court has previously defined 'sentencing offense' in the context of OVs as the crime of which the defendant has been convicted and for which he or she is being sentenced." *People v Carter*, 503 Mich 221, 227; 931 NW2d 566 (2019) (quotation marks and citation omitted).

Defendant argues that the trial court erred by assessing 15 points for OV 5. "OV 5 is scored when a homicide or homicide-related crime causes psychological injury to a member of a victim's family." *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017). MCL 777.22, which governs the scoring of offense variables, provides: "Score offense variables 5 and 6 for homicide, attempted homicide, conspiracy or solicitation to commit a homicide, or assault with intent to commit murder." An assessment of 15 points for OV 5 is appropriate if "[s]erious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). OV 5 may be scored at 15 points or zero points. MCL 777.35. In the instant matter, defendant was not convicted of any of the offenses subject to an assessment of points for OV 5. Thus, the trial court plainly erred when it assessed 15 points to OV 5, and it should have assessed zero points for OV 5.

Defendant further argues that the trial court erred assessing by 50 points for OV 7 because there was no evidence that MLA suffered injuries in excess of what was necessary to constitute the torture offense. We agree.

MCL 777.37(1) states, in pertinent part:

---

[5] Defendant's challenge to the scoring of OV 5 on appeal is based on grounds different than those asserted at sentencing, and defendant did not contest the scoring of OV 7 at sentencing, in a motion for resentencing, or in a motion to remand in this Court. Accordingly, these issues are not preserved. See *People v Hershey*, 303 Mich App 330, 347; 844 NW2d 127 (2013).

> (1) Offense variable 7 is aggravated physical abuse. Score offense variable 7 by determining which of the following apply and by assigning the number of points attributable to the 1 that has the highest number of points:
>
> (a) A victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense ................................................................. 50 points
>
> (b) No victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense ................................................................. 0 points

"A trial court can properly assess 50 points under OV 7 if it finds that a defendant's conduct falls under one of the four categories of conduct listed in subsection (1)(a)." *People v Hardy*, 494 Mich 430, 439-440; 835 NW2d 340 (2013), superseded by statute on other grounds as stated by *People v Rodriguez*, 327 Mich App 573, 579 n 3 (2019). "OV 7 is designed to respond to particularly heinous instances in which the criminal acted to increase [a victim's] fear by a substantial or considerable amount." *People v Rosa*, 322 Mich App 726, 743; 913 NW2d 392 (2018) (quotation marks and citation omitted). "Although all crimes against a person involve the infliction of a certain amount of fear and anxiety," the trial court "may consider conduct inherent in a crime" when scoring OV 7. *Id*. (quotation marks and citation omitted). In determining the proper assessment of points for OV 7, "we must consider whether the defendant engaged in conduct beyond the minimum required to commit the offense and, if so, whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount." *People v Rodriguez*, 327 Mich App 573, 579; 935 NW2d 51 (2019) (quotation marks and citation omitted).

In the instant matter, defendant was convicted of torture which requires proof beyond a reasonable doubt that (1) defendant intended to cause cruel or extreme physical or mental pain and suffering, (2) defendant inflicted great bodily injury, and (3) the complainant was within defendant's custody and control. MCL 750.85; *Schaw*, 288 Mich App at 233-234. The evidentiary record does not demonstrate that defendant engaged in conduct—beyond the minimum necessary to commit the offense—to warrant an assessment of 50 points. Defendant's act of binding, or allowing Scott to bind, MLA with zip ties on numerous occasions patently troubling behavior; however, there was no testimony presented that defendant committed any additional acts during the binding incidents that would constitute further torture, sadism, excessive brutality, or similarly egregious conduct, such as yelling or taunting MLA, physically discipling the minor child while he was restrained, or otherwise causing injuries beyond the "great bodily injury" that served as the basis of the torture conviction. See *McFarlane*, 325 Mich App at 534 ("The severity of the injuries supported a finding that [the complainant] was treated with brutality in excess of that which necessarily accompanies the commission of first-degree child abuse," warranting an assessment of 50 points for OV 7); see also *Rosa*, 322 Mich App at 744 (opining OV 7 was properly assessed 50 points considering the defendant, who was convicted of assault with the intent to commit murder, attempted to strangle the complainant three times, intended to sexually abuse the complainant, and threatened the complainant's child over the course of the assault). Furthermore, the trial court did not explain how or why an assessment of 50 points for OV 7 was appropriate during the sentencing hearing.

Defendant's total for all offense variables was 130 points, or Level VI of the A-class sentencing grid. See MCL 777.62. Because OVs 5 and 7 were incorrectly assessed, defendant's total OV score would decrease from 130 points to 65 points, as OV 7 may be scored at either 50 points or zero points, and OV 5 may be scored at either 15 points or zero points. The change in the total assignments of points for the offense variables would shift the OV level from VI to IV, altering defendant's sentencing guidelines range, entitling her to resentencing. See *People v Francisco*, 474 Mich 82, 92; 711 NW2d 44 (2006) ("Because defendant's sentence here is based upon an inaccurate calculation of the guidelines range and is, therefore, inconsistent with the law, defendant is entitled to be resentenced").

We affirm defendant's convictions, but we vacate defendant's sentences and remand the matter to the trial court for resentencing consistent with this opinion. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Mark J. Cavanagh
/s/ Michael J. Riordan